UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN MENZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:04CV77 (RWS) |
| | ) | |
| vs. | ) | |
| | ) | |
| THE PROCTER & GAMBLE | ) | |
| HEALTH CARE PLAN; et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR INTERIM FEES AND COSTS WITH LEAVE TO FILE
INTERMIM FEE AND COST SPECIFICATION UPON DETERMINATION**

This matter is before the Court on Plaintiff's Motion for Attorney's Fees and Costs.  In support of said Motion, Plaintiff states as follows:

### I.    STATEMENT OF FACTS

During all times relevant, Plaintiff has been eligible to receive insurance benefits from the Procter & Gamble Health Care Plan ("the Plan").  See excerpts from the Plan attached hereto as Exhibit 1.

On or about October 3, 2002, Plaintiff's left arm was amputated above the elbow as a result of an accident.  Plaintiff filed a claim with the Plan seeking benefits for a myoelectric prosthetic arm (a.k.a. a "Utah arm").

In response to his claim, Defendant Healthlink[1] sent Plaintiff for three (3) different prosthetics evaluations:  (1) Hanger's National Upper Extremity Prosthetics Program (March 25, 2003 examination), (2) Orthotics & Prosthetic Lab, Inc. (April 14, 2003 examination), and (3)

---

[1] Healthlink was retained by the Plan.  It may be an administrator under Pages 7 and 14 of the Plan.  The Plan advises that others besides the employer are administrators.

Cape Prosthetics - Orthotics (May 1, 2003 examination). See reports of Hanger's National Upper Extremeity Prosthetics Program, Orthotics & Prosthetic Lab, Inc. dated , and Cape Prosthetics - Orthotics attached hereto as "Exhibits 2, 3 and 4", respectively. All three (3) of Healthlink's evaluators determined Plaintiff should have a primary myoelectric prosthetic arm, sometimes referred to in the reports as a "Utah arm". Id. Only the report of Othotics & Prostetic Lab, Inc. addressed medical necessity, concluding that a myoelectric prothesis was in fact medically necessary to Plaintiff. Ex. 3, p. 2.

After all three (3) of Defendant Healthlink's own prosthetic evaluators concluded Plaintiff should receive a myoelectric prosthesis, Defendants obtained an opinion from an unidentified mystery reviewer dated June 5, 2003. See report of mystery reviewer dated June 5, 2003 attached hereto as "Exhibit 5". The mystery reviewer concluded that a myoelectric prosthesis was inappropriate based on speculation that Plaintiff would be dissatisfied with it. Id. The unidentified reviewer has never met, interviewed, nor examined Plaintiff. He or she (?) made no suggestion of having conducted a peer-to-peer review. Id.

On or about June 9, 2003, the Plan, through The Epoch Group, L.C. ("Epoch") denied Plaintiff's claim for a myoelectric prosthetic arm. See copy of letter from Epoch dated June 9, 2003 attached hereto as "Exhibit 6". The denial letter is based on "review" by an unidentified "outside medical consultant"[2], and ignores all three (3) prosthetics evaluations obtained by

---

[2] Interestingly, although Defendants failed to identify their medical reviewer, Defendants' own September 23, 2003 denial letter expressly recognizes the Secretary of Labor's requirement that the identity of outside reviewers be disclosed, 29 C.F.R. Sec. 2560.503-1(h)(3)(iii) & (iv), as it states, "Specifically, the claims procedures provide… [f]or the identification of medical or vocational experts whose advice was obtained on behalf of the Plan in connection with a claimant's adverse benefit determination, without regard to whether the advise was relied upon in making the benefit determination…". Ex. 7. Hence, we have not only egregious conduct, but

Defendant Healthlink.  Id.  Defendants concluded, "The myoelectric upper extremity prosthesis is not medically necessary in this patient."  Id.  Defendants failed to provide Plaintiff reference to any plan provision on which the determination was based[3].  Id.  Rather than include a description of the Plan's review procedures, the time limits applicable to such procedures, and a statement of Plaintiff's right to bring a civil action under Section 502 of ERISA following adverse benefit determination on review, Defendants merely said, "We would be happy to review any additional documentation you would like to submit in support of this claim."  Id.

Plaintiff thereafter appealed such denial of benefits for the **first** time.

On or about September 23, 2003, the Plan denied Plaintiff's first appeal.  See copy of letter from Epoch dated September 23, 2003 attached hereto as "Exhibit 7".  Defendants provide only one (1) reason for denial: "The consultant is maintaining the denial of the myoelectric prosthetic upper extremity prosthetic upper extremity prosthesis".  Id.  Again, the denial was based only on "review" by an unidentified mystery "consultant".  Id.  Again, Defendants provided no reference to any plan provision on which the determination was based.  Id.  The denial letter does purport to advise Plaintiff of his appeal rights and procedures[4].  Id.

---

willful violation.  The regulations are to be given meaningful effect.  See i.e. Black & Decker Disability Plan vs. Nord, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

[3] There is no Plan provision which requires "medical necessity" for provision of prosthetic devices.  See Ex. 1, p. 29.  While the Plan expressly requires medical necessity for other types of benefits provided on the same page of the summary plan description, such as outpatient breast reduction surgery and outpatient nasal surgery, it contains absolutely no such requirement for prosthetics.  Ex. 1, p. 29.

[4] Although the letter referenced "(2) two levels of appeals", the Summary Plan Description, by which Defendants are bound, only provides one (1) appeal from denial of benefits.  Defendants attempt to confuse Plaintiff and the Court by misapplying the two (2) appeal procedure applicable to denials of enrollment to this case of denial of benefits.  Ex. 1, p. 69.  There is no dispute that Plaintiff was enrolled in the Plan.

On or about October 22, 2003, Plaintiff appealed the Plan's denial of benefits for the **second** time. See copy of letter from Plaintiff's attorney, John Layton, attached as "Exhibit 8".

With his second appeal, Plaintiff submitted to the Plan a report of Dr. Okasana Volshteyn of the Washinton University School of Medicine[5] Department of Neurology dated October 1, stating:

> "This patient presents with left Transhumeral amputation and s/p right distal radius fracture with instability of the wrist secondary to dorsal tilt of distal radius ( per scan and fluoroscan), as well as pain and weakness of the right shoulder and scapula as related to the pre-existing trauma to the rotator cuff muscles. In order for this patient to return to reasonable level of function, as well as to return to his job as a rancher, it is important to provide him with the most appropriate prosthesis. **Because of the weakness and instability of the shoulder - scapula complex, he will not be able to use conventional prosthesis which requires hardness of the prosthesis to go over the sound extremity as well as repetitive shoulder movements in order to operate the prosthesis. Conventional prosthesis will be medically contraindicated for this patient since it will only increase the level of the pain, instability and subsequent deterioration of the shoulder joint and rotator cuff muscles, and further weakness and instability of shoulder - scapula complex. The only medically appropriate prosthetic device for Mr. Menz is myoelectric prosthesis**."

See report of Dr. Volshteyn dated October 1, 2003 attached as "Exhibit 9" (emphasis added).

Shortly thereafter, Plaintiff submitted to the Plan a second report from Dr. Volshteyn dated October 31, 2003 which **again** stated:

> "Steven Menz presents with left Transhumeral amputation and s/p right distal radius fracture with instability of the wrist secondary to dorsal tilt of distal radius as well as pain and weakness of the right shoulder and scapula as related to the pre-existing trauma to the rotator cuff muscles.
> **In order for this patient to return to reasonable level of function, as well as to return to his job as a rancher, it is important to provide him with the most appropriate prosthesis. Because of the weakness and instability of the right shoulder-scapula complex, he will not be able to use conventional prosthesis which**

---

[5] The Washington University School of Medicine is one of the leading medical institutions in the country, and its medical staff enjoys a world-renowned reputation for the reliable assessment and delivery of medical services. The Court should take judicial notice of such fact pursuant to Federal Rule of Evidence 201.

4

> **requires harness of the prosthesis to go over the sound extremity as well as repetitive shoulder movement in order to operate the prosthesis.**
> **Conventional prosthesis will be medically contraindicated for this patient since it will only increase the level of the pain, instability and subsequent deterioration of the shoulder joint and rotator cuff muscles, and further weakness and instability of shoulder - scapula complex.**
> **The only medically appropriate prosthetic device for Mr. Menz is myoelectric prosthesis.**
> I thank you in advance for your consideration of this unfortunate case. **Patient needs to return to adequate qualify of life and gainful employment as soon as possible**."

See letter from Dr. Volshteyn attached hereto as "Exhibit 10" (emphasis added).

On or about December 4, 2003, the Plan denied Plaintiff's second appeal. See letter from Epoch dated December 4, 2003 attached hereto as "Exhibit 11". Again, the denial was "based on a second review by an outside medical consultant." Id. However, Defendants again failed to identify their mystery reviewer. Defendants again applied the "medically necessary" standard without identifying any Plan provision relied upon[6]. Unlike the September 23, 2003 denial letter, the December 4, 2003 denial letter contains no notice of further requirements for administrative exhaustion nor any notice of further appeal procedures. Ex. 11.

Despite Dr. Volshteyn's two (2) reports (quoted above), in denying Plaintiff's second appeal, the Plan and its mystery reviewer never claimed to have considered that Plaintiff cannot use a conventional prosthesis due to previous injuries to his right shoulder and right wrist, weakness and instability to his right shoulder and wrist, and future damage thereto.

The Plan failed to obtain any medical examination of Plaintiff. It sought no peer-to-peer review.

In December, 2004, Plaintiff and his wife, Jennifer Menz, attempted to pursue further administrative efforts to obtain the myoelectric prosthetic arm. However, in response to such

---

[6] See fn. 2 above.

5

efforts, Mike Jennewein, Defendant Procter & Gamble's Human Resources Manager, informed Mrs. Menz that Plaintiff had already exhausted all of the Plan's administrative appeals, told her that no more internal procedures were available to Plaintiff, said that he could not help her, and said he had no further options to help her.  See declaration of Jennifer Menz attached hereto as "Exhibit 12".

Based on the foregoing, Plaintiff decided to file suit.

On January 16, 2004, Plaintiff's attorney faxed and e-mailed to all Defendants notice of intent to obtain a Temporary Restraining Order ("TRO") on January 21, 2004.  See copy of letter from Plaintiff's counsel, Mark Potashnick, to Defendants dated January 16, 2004.  Attached to the letter was a third report of Dr. Volshteyn dated December 31, 2003 which reiterated her two (2) earlier reports submitted to the Plan during the second administrative appeal as follows:

> "**It is not clear to me why myoelectric limb was denied by the insurance company. The denial letter states that it was denied because it was 'not considered medically necessary for the following concerns:  The non-use due to inconvenience and discomfort, the recommendation to avoid moisture, and the physical demands of the patient's vocation.'  This statement makes no sense to me.  Patient requires myoelectic limb because he, for medical reasons, is not able to use conventional prosthesis, since he has rotator cuff muscles pathology on the right side causing persistent pain, shoulder-scapula instability and weakness.  Right shoulder will be required to operate the conventional prosthesis for this patient.  If he is to use conventional prosthesis he will develop further deterioration of rotator cuff and accelerated development of shoulder arthritis and instability of the shoulder joint. In addition, he most likely will further aggravate right wrist / hand secondary to overuse trying to compensate for the right shoulder weakness and instability.  So, in a long run he might even lose the function of his 'good' arm.**
> **Another potential risk is further worsening of muscle atrophy of the residual limb secondary to prolonged disuse whether Steve has conventional prosthesis or has no prosthesis at all since in either case he will not be actively using the muscles of his residual limb for functional activities.  At that point, the operation of myoelectric prosthesis might become quite difficult**."

See Dr. Volshteyn's notes dated December 31, 2003, which have been submitted into the administrative record, attached hereto as "Exhibit 13" (emphasis added).

6

Plaintiff filed this action on January 21, 2004 along with his Application for TRO, Preliminary Injunction and Permanent Injunction. The primary objective of suit was to obtain benefits for a myoelectric prosthesis.

At a conference before the Court on January 21, 2004 regarding the Application for TRO, Defendants requested continuance of the TRO hearing until Monday, January 26, 2004 in order to determine whether the matter could be resolved without a TRO hearing. Plaintiff's consented to such extension. The Court re-scheduled the TRO hearing for January 26, 2004 at 3:30 p.m.

The day before suit was filed, Jennifer Ting, Procter & Gamble's benefits counsel, proposed to raise a new defense, that the care was not covered (excluded) because it was a workers compensation covered event. See affidavit of Sheldon Weinhaus attached hereto as Exhibit 14, para. 3(a). Such defense had not previously appeared in any denial letter and neither Plaintiff nor his wife had ever heard about it. Id.

On Friday, January 23, 2004, Defendants again requested continuance of the TRO hearing until Thursday, January 29, 2004 in order to determine whether the matter could be resolved without a TRO hearing. Plaintiff's consented to such extension. The Court re-scheduled the TRO hearing for January 29, 2004 at 3:00 p.m.

On the afternoon of Wednesday, January 28, 2004, Defendants' attorney notified Plaintiff's attorney that Defendants had decided to voluntarily provide Plaintiff benefits for the myoelectric prosthetic arm without a TRO hearing.

The parties appeared before the Court on Thursday, January 29, 2004 for a status conference. Therein, Defendants' attorney informed the Court that his clients had decided to voluntarily provide Plaintiff the myoelectric prosthetic arm sought in this litigation.

On or about February 2, 2004, Defendants issued Plaintiff a letter stating "it has been determined that benefits will be allowed for the myoelectric prosthesis".  See letter from Debbie Angel of Defendant The Epoch Group, L.C. attached hereto as "Exhibit 15".

Based on Defendant's voluntary change of position, on February 3, 2004 this Court issued an Order denying Plaintiff's Motion for Temporary Restraining Order as moot and denying Plaintiff's Motion for Preliminary Injunction without prejudice.  See copy of February 3, 2004 Order attached hereto as "Exhibit 16".

Obviously, this suit brought forth Defendant's voluntary reversal of their three (3) earlier denials of benefits.

## II.     ARGUMENT

The Eighth Circuit has recognized five (5) factors considered in awarding attorneys' fees in an ERISA case:

> "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions."

Lawrence vs. Westerhaus, 749 F.2d 494, 496 (8th Cir. 1984); Brown vs. Aventis, 341 F.3d 822 (8th Cir. Sept. 9, 2003).

The first factor is satisfied as the Defendants' culpability[7], bad faith and dilatory tactics were exhibited through their sudden reversal of determination, without any offer by Plaintiff of new medical evidence.  Again, Dr. Volshteyn's December 31, 2003 report merely reiterates her two (2) earlier reports ignored by Defendants in the second appeal, but adds no further

---

[7] Culpability does not require a showing of bad faith or wrongful motive.

8

substantive medical information. Had Defendants desired to provide benefits according to the Plan in the first place, this lawsuit, and all of the associated expenses and delays, would have been unnecessary. Obviously, denying appropriate benefits until claimants are required to incur the effort and inconvenience, and in some cases substantial expense, of filing suit will save the Plan money because many claimants and prospective claimants will be discouraged. Such behaviors must be disincentivized through available means, including awards of attorneys' fees.

Further evidence of culpability, bad faith, and dilatory tactics is found in (1) Defendants complete disregard for applicable regulations in processing and appeal of Plaintiff's claim, (2) Defendants' complete failure to advise Plaintiff of the review procedures and time limits in their initial denial, (3) their repeated failures to identify their mystery reviewers, (4) their blatant ignoring of Plaintiff's medical evidence, (5) their unwarranted imposition of the "medically necessary" standard, (6) their failure to identify any Plan provision relied upon in denying benefits, and (7) their attempt to substitute a new reason for denial on the eve before litigation was filed.

At the time of the June 9, 2003 denial, Defendants were required under 29 C.F.R. Sec. 2560.503-1(g)(1)(iv) to provide Plaintiff "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring civil action under section 502(a) of the Act [ERISA] following an adverse benefit determination on review." Id. Also, assuming arguendo, that additional appeal procedures were available at the time of the December 4, 2004 denial, Defendants had a duty under 29 C.F.R. Sec. 2450.503(g)(1)(iv) to disclose such procedures and the applicable time limits. However, Defendants completely ignored such requirement, unreasonably hampering administrative review.

In <u>Conley vs. Pitney Bowes</u>, 34 F.3d 714 (8th Cir. 1994), the Eight Circuit held the defense of failure to exhaust administrative procedures fails without notice of further appeal procedure upon denial of a claim. <u>Id</u>., 34 F.3d at 717-18. Here, neither the original notice of denial dated June 9, 2003 nor the third notice of denial dated December 4, 2003 contain any notice of further appeal rights, requirements or procedures. Thus, Defendants' claims of failure to exhaust must be rejected under <u>Conley</u>.

Defendants were required under 29 C.F.R. Sec. 2560.503-1(h)(iv) to "Provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination". <u>Id</u>. However, Defendants again completely ignored such requirement. Although Defendants may attempt to argue that they were not required to identify their experts until requested by Plaintiff, 29 C.F.R. Sec. 2560.503-1(h)(3)(iv) mandates such identification regardless of whether or not requested by the claimant. Moreover, in their September 23, 2003 denial, Defendants expressly acknowledge such requirement, as they state, "Specifically, the claims procedures provide… For the identification of medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination…" Defendants' failure to identify the experts hampered Plaintiff's ability to determine and challenge the credentials, experience and bias of the reviewer and to effectively pursue his appeals. This can only be interpreted as egregious misconduct.

Under 29 C.F.R. Sec. 2560.503-1(h)(2)(iv), Defendants were required to "Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was

10

submitted or considered in the initial benefit determination." Id. However, Defendants repeatedly ignored all of Plaintiff's medical evidence. None of the three (3) denial letters shows any consideration whatsoever of Plaintiff's inability to use a conventional prosthesis due to his right shoulder and wrist weakness and instability or consideration of further injury thereto, the conditions which necessitate a myoelectric prosthesis. Moreover, Defendants had no contrary medical opinion or evidence whatsoever. Their mystery reviewer only provided speculation as to whether Plaintiff would be dissatisfied with the myoelectric arm. See Curtin vs. Unum Life Ins. Co. of Am., 2004 U.S. Dist. Lexis 544, *22-23 (D.ME 2004)(insurer is not allowed to disregard the opinion of treating physicians in the absence of medical evidence contrary to the treating physician's opinion).

 Defendants imposed a "medically necessary" standard on Plaintiff which is not contained in the Plan. Here, the various types of "other services" provided by the Plan are listed in pages 27 through 29 of the Plan, including "Prosthetic Devices", "Surgery: Breast Reduction (Outpatient)", and "Surgery: Nasal (Outpatient)". Ex. 1, pp. 27-29. While the Plan expressly requires that outpatient breast reduction surgery and outpatient nasal surgery "Must be medically necessary", the Plan contains absolutely no such requirement of medical necessity for prosthetic devices. Ex. 1, p. 29. Such disparate use of terms and requirements indicates purposeful intent to provide prosthetics without medical necessary. Also, suspiciously, two (2) of the three (3) prosthetic evaluations obtained by Defendant Healthlink fail to consider medical necessity. Yet, Defendants later attempted to impose such standard. See Haberman-Hall vs. Continental Assur. Co., 2003 U.S. Dist. Lexis 6310, *12 (D.MN 2003), (abuse of discretion in applying incorrect standard for benefits eligibility; Vizcaino vs. Microsoft Corp., 120 F.3d 1006, 1013 (9th Cir. 1997)(arbitrary and capricious to apply wrong standard to benefit determination); Saffle vs.

Sierra Pacific Power Co. Long Term Disabilty Plan, 85 F.3d 455 (9th Cir. 1996)(abuse of discretion to insert additional plan terms or requirements).

Defendants were required under 29 C.F.R. Secs. 2560.503-1(g)(1)(ii) and (j)(2) to provide "reference to the specific plan provisions on which the benefit determination was based". Id.  However, none of the three (3) denials refer to any plan provision whatsoever.  Such failure is obviously due to absence of a "medical necessity" requirement for prosthetic benefits.

Defendants attempted to substitute another reason for denial to dissuade litigation. Specifically, the day before filing, Defendants first claimed that Plaintiff was not entitled to benefits under an exclusion for injuries eligible for coverage by workers' compensation coverage. An ERISA plan is bound by the reasons for denial stated in the administrative process.  A court may not consider a new reason for claim denial offered for the first time on judicial review."  See i.e. Thompson vs. Life Ins. Co. of N.A., 30 Fed. Appx. 160, 164 (4th Cir. 2002); Reich vs. Ladish Co., Inc., 306 F.3d 519, 524 (7th Cir. 2002); Vizcaino, supra, 120 F.3d at 1016; also see Marolt vs. Alliant Techsystems, Inc., 146 F.3d 617, 620 (8th Cir. 1998)("We will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation.").

29 C.F.R. 2560.503-1(b)(2) requires that "The claims procedures do not contain any provision, and are not administered in a way, that unduly inhibits or hampers the initiation or processing of claims for benefits."  The above-listed actions, considered either individually or cumulatively, not only establish that Defendants hampered Plaintiff's ability to pursue his claim, but show ample culpability, bad faith, and dilatory tactics justifying an award of attorney's fees under the Eighth Circuit's Lawrence test.  See Cook vs. New York Times Co. Long-Term Disability Plan, 2004 U.S. Dist. Lexis 1259, *66-67 (S.D.NY Jan. 30, 2004)(attorney's fees

awarded when "Defendant wrongfully denied plaintiff the opportunity for a full and fair review, forcing her to bring the present lawsuit").

The second Lawrence factor is fulfilled as Defendants, especially Procter & Gamble itself, are very large companies with ample ability to pay the attorney's fees sought.

The third Lawrence factor is met as an award of attorneys' fees will certainly deter Defendants and others from similar culpable, bad faith, and dilatory conduct. Only monetary penalty will deter resistance of large companies such as Procter & Gamble, hoping claimants are unable to find an ample bar ready to sue. As stated above, requiring claimants to sue, with the associated effort and expense, prior to benefit approval must be deterred by any proper means including fee awards.

The fifth factor weighs heavily in favor of Plaintiff as the medical information in Defendants' possession clearly established Plaintiff's need for a myoelectric prosthesis and entitlement to benefits prior to the suit. Moreover, without obtaining legal representation and pursuing litigation, Plaintiff would not have been able to obtain the benefits to which he is clearly entitled under the Plan. Congress obviously wanted claimants to have "ready access" to the federal courts. 29 U.S.C. Sec. 1001(b). But it demanded they be given full and fair review first. This they cannot have without the award of fees.

Also, as Plaintiff sought medical treatment, rather than monetary damages herein, the only feasible means to compensate his counsel for obtaining the necessary treatment is to award fees. Defendants only intend to pay the prosthetics company. Plaintiff himself is financially unable to pay his counsel, in part due to his inability to effectively perform his occupation without the myoelectric arm. Certainly, failing to award fees will discourage ERISA attorneys from bringing claims for needed medical treatment and other benefits in the future. Congress

must have provided for recovery of attorney's fees in Section 502(g)(1) of ERISA, 29 U.S.C. Sec. 1132(g)(1), to compensate attorneys who would otherwise receive less that equitable compensation.

In sum, the Eight Circuit's five (5) factors, plus the fact that Plaintiff's attorneys will otherwise go uncompensated for nearly all of their efforts, heavily weigh in favor of an award of attorneys' fees and costs to Plaintiff.

Although the Plan may claim that attorneys fees are improper because Plaintiff failed to exhaust his administrative appeals prior to litigation, (1) the exhibits hereto substantiate that he pursued a claim for benefits, then two administrative appeals while the Plan only requires one such appeal, (2) Plaintiff is "deemed to have exhausted" his administrative appeals under the regulations because of Defendants failures to follow the regulations (as explained above), and (3) Defendants should be estopped from denying exhaustion by their own conduct.

Page 69 of the Summary Plan Description ("SPD") provides for only one (1) administrative appeal of benefit denial or reduction[8]. Ex. 1, p. 69. Although the September 23, 2003 letter references two (2) appeals, the Plan itself provides only one (1) appeal of denial of benefits. Ex. 1, p. 69; see i.e. Palmisano vs. Allina Health Systems, Inc., 190 F.3d 881, 888 (8th Cir. 1999)(ERISA requires that employee benefit plans "be established and maintained pursuant to a written instrument," and "provide a procedure for amending such plan." 29 U.S.C. Sec. 1102(a)(1), (b)(3).  "Statement by plan may not be construed as controlling or modifying the eligibility requirements in the formal plan because "ERISA precludes oral or informal amendments to a plan, by estoppel or otherwise."); Houghton vs. SIPCO, Inc., 38 F.3d 953, 958

---

[8] Defendants apparently attempt to substitute the two (2) appeals available for denial of enrollment under the Plan for the one (1) appeal available for denial of benefits. Ex. 1, p. 69.

(8th Cir. 1994); <u>Deas vs. Nation Sheet Metal Workers Pension Fund</u>, 114 F.Supp.2d 1259, *57 (D.AL 2000)(rejected plan's argument of failure to exhaust when plan pointed to no specific appeal procedure in plan which plaintiff failed to utilize). In sum, the Plan has already had a second chance to correct its earlier errors, but failed to do so.  The Plan does not "enjoy" a third opportunity to conduct a valid administrative appeal upon submission of Dr. Volshteyn's December 31, 2003 report.  29 C.F.R. Sec. 2560.503-1(c)(2) even mandates that "The claims procedures do not contain any provision, and are not administered in a way, that requires a claimant to file more than two appeals of an adverse benefit determination prior to bringing a civil action under section 502(a) of the Act".  <u>Id</u>.  Thus, Plaintiff complied with the Plan prior to litigation.

  Plaintiff also exhausted his administrative remedies under the regulations as Defendants failed to follow reasonable claims procedures.  29 C.F.R. Sec. 2560.503-1(l) provides:

> "In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be **deemed to have exhausted** the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."

<u>Id</u>. (emphasis added). 29 C.F.R. Sec. 2560.503-1(b)(1) specifies "The claims procedures for a plan will be deemed to be reasonable if--(1) The claims procedures comply with the requirements of paragraphs (c), (d), (e), (f), (g), (h), (i), and (j) of this section…". <u>Id</u>.  Thus, the above-listed failures to comply with 29 C.F.R. Secs. 2560.503-1(g)(1)(iv)(failure to provide description of review procedures and time limits with initial denial), 2560.503-1(h)(iv)(failure to identify medical reviewer); 2560.503-1(h)(2)(iv)(failure to consider evidence submitted in appeal); and 2560.503-1(g)(1)(ii) and (j)(2)(failure to refer to plan provisions used in denial and

15

appeal), either considered individually or cumulatively, result in Plaintiff being "deemed to have exhausted" the administrative procedures. In other words, under the regulation, Defendants cannot claim failure to exhaust when they failed to follow the regulations.

Defendants may claim Plaintiff did not exhaust his administrative procedures because suit was filed before Defendants' consideration of Dr. Volshteyn's December 31, 2003 report. Such argument fails for all the above-listed reasons plus Defendants' failure to comply with 29 C.F.R. Sec. 2560.503-1(h)(4)(i)(2). That regulation requires, "In the case of a claim involving urgent care, the plan administrator shall notify the claimant, in accordance with paragraph (j) of this section of the plan's benefit determination on review as soon as possible, taking into account the medical exigencies, but not later than 72 hours after receipt of the claimant's request for review of an adverse benefit determination by the plan". Id. Dr. Volshteyn's October 31, 2003 report states, "Patient needs to return to adequate quality of life and gainful employment as soon as possible." Nevertheless, Defendants waited until December 4, 2003 to deny benefits in the second appeal. Dr. Volshteyn's December 31, 2003 report verifies risk to Plaintiff of "muscle atrophy of the residual limb secondary to prolonged disuse" and as a result "the operation of myoelectric prosthesis might become quite difficult." (emphasis added). Defendants received such report on January 16, 2003. Thus, pursuant to 29 C.F.R. Sec. 2560.503-1(h)(4)(i)(2), Defendants' determination on review was due by January 19, 2003. Nevertheless, Defendants failed to comply with the time limitation imposed by the regulations, thereby Plaintiff was again "deemed to have exhausted" his administrative appeals under 29 C.F.R. Sec. 2560.503-1(l).

Finally, Mr. Jennewein, Defendant Procter & Gamble's Human Resources Manager, , informed Mrs. Menz that Plaintiff had already exhausted all of the Plan's administrative appeals, told her that no more internal procedures were available to Plaintiff, said that he could not help

her, and said he had no further options to help her. Defendants cannot now claim that Plaintiff failed to exhaust his administrative procedures when they earlier refused to permit such procedures, if they in fact existed.

Under the "catalyst theory", a party may recover attorneys' fees and costs of litigation when the lawsuit brings forth "voluntary change" by the defendant. Christina A vs. Bloomberg, 315 F.3d 990, 992 (8th Cir. 2003)[9]. No enforceable judgment or comparable relief through a consent decree or settlement is needed under the "catalyst theory". Tyler vs. Corner Construction Corp., Inc., 167 F.3d 1202, 1205 (8th Cir. 1999). This suit clearly brought forth Defendants' reversal of its previous three (3) denials of benefits and resulted in approval of benefits for a myoelectric prosthesis, achieving the primary objective of suit. Rather than

---

[9] Although, in Buckhannon Board & Care, Inc. vs. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 149 L.Ed.2d 855, 121 S.Ct. 1835 (2001), the Supreme Court extinguished the "catalyst theory" with respect to fee-shifting dignitary statutes using the language "prevailing party", ERISA contains no such language.  29 U.S.C. Sec. 1132(g)(1). Since Buckhannon, several federal courts have expressly recognized that the "catalyst theory" still applies absent the "prevailing party" language. See i.e. Center for Biological Diversity vs. Norton Center for Biological Diversity vs. Norton, 262 F.3d 1077, 1080 (10th Cir. 2001); Sierra Club vs. Environmental Protection Agency; Sierra Club vs. Environmental Protection Agency, 322 F.3d 718, 723-725 (D.C.Cir. 2003); Loggerhead Turtle vs. County Council of Volusia County, 307 F.3d 1318, 1326 (11th Cir. 2002); Conservation Law Foundation, Inc. vs. Evans, 2003 U.S. Dist. Lexis 5566 (D.MA 2003); also see Martin vs. Ark. Blue Cross & Blue Shield, 299 F.3d 966, 971 (8th Cir. 2002)(ERISA does not closely correspond with the fee-shifting scheme in the civil rights statutes).  In Adams vs. Bowater Inc., 313 F.3d 611 (1st Cir. 2002), the court specifically found that ERISA statute is "differently phrased" and Buckhannon will not govern.  Id., 615. The Eighth Circuit has held, at least twice, that Buckhannon "applies broadly to fee-shifting statutes that employ the 'prevailing party' language." Christina A. vs. Bloomberg, 315 F.3d 990, 997 n.2 (8th Cir. 2003): Cody vs. Hillard, 304 F.3d 767, 773 n.3 (2002).  Under the Eighth Circuit holdings, Buckhannon would not apply to ERISA cases as the "prevailing party" language is not found in ERISA.  In the recent case of Geissal vs. Moore Medical Corp., 338 F.3d 926 (8th Cir. July 31, 2003)(Eighth Circuit appeal nos. 02-2255 and  02-2256, the Eighth Circuit sub silentio rejected Buckhannon when vigorously advanced by Greensfelder, Hemker & Gale, since the Eighth Circuit affirmed the District Court's grant of  recovery of attorney's fees under ERISA even though the District Court found the plaintiff obtained no remedy for herself.

attempt to explain or justify their multiple violations of the Secretary of Labor's regulations (as more fully explained above), Defendants promptly "caved in" and decided to approve Plaintiff's benefit and avoid the expense of defending, then losing this case.

Although Defendants may claim that the "catalyst" was Dr. Volshteyn's December 31, 2003 report rather than this suit, such report merely reiterated and re-emphasized the substance of her two (2) earlier reports which had been submitted to the Plan in the second appeal. Defendants had no new substantive information on which to rely when they approved benefits after suit. Moreover, Defendants cannot reasonably claim the "catalyst" was Dr. Volshteyn's third opinion when they ignored, and refused to act upon, her same opinion the first two (2) times Plaintiff submitted it. Also, Defendants' blatant disregard of all three (3) of Defendant Healthlink's own prosthetic evaluators indicates that Defendants were unwilling to provide the myoelectric prosthesis absent the pressure of litigation. Thus, this suit, not Dr. Volshteyn's third iteration of the same medical opinion, brought forth Defendants' voluntary reversal.

Plaintiff is therefore entitled to attorneys' fees and costs as this suit brought about voluntary change by Defendants and the Eighth Circuit's <u>Lawrence</u> factors are satisfied.

### III.   CONCLUSION

For all reasons aforesaid, Plaintiff's Motion for Interim Fees and Costs with Leave to File Interim Fee and Cost Specification Upon Determination should be granted in full.

              Respectfully Submitted,

              _/s Sheldon Weinhaus_
              Sheldon Weinhaus, #4670
              906 Olive Street, Suite 900
              St. Louis, Missouri  63101
              Telephone: (314) 621-8363
              Facsimile: (314) 621-8366

and

MARK POTASHNICK, P.C.
Mark Potashnick, #35970
111 Westport Plaza, Suite 600
St. Louis, Missouri 63146
Telephone: (314) 275-9150
Facsimile: (314) 275-9151

Attorneys for Plaintiffs